UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NICHOLAS IPPOLITO,

                Plaintiff,

      -vs-

GLENN GOORD, Commissioner of New
York State Department of
Correctional Services; DR. LESTER
WRIGHT, Deputy Commissioner for
Health Services, NYS Department of
Correctional Services and their
successors in office, all in their
official capacities and
individually; THOMAS EDWARDS,
Physician Assistant, Attica
Correctional Facility, All
Individually; and NEW YORK STATE
DEPARTMENT OF CORRECTIONAL SERVICES
and their successors in office, all
in their official capacities and
individually,

                Defendants.

**DECISION AND ORDER**
**No. 05-CV-6683(MAT)**

---

## I.   Introduction

In this action commenced pursuant to 42 U.S.C. § 1983, pro se plaintiff Nicholas Ippolito ("Ippolito" or "Plaintiff"), an inmate in the custody of the New York State Department of Correctional Services and Community Supervision ("DOCCS") alleges that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution by failing to treat his chronic Hepatitis C ("HCV").

-1-

Defendants have moved for summary judgment asserting that former DOCCS Commissioner Glenn Goord ("Goord") and Physician's Assistant Thomas Edwards ("P.A. Edwards") lack the personal involvement to be liable under 42 U.S.C. § 1983; that Plaintiff cannot prove that Lester Wright, M.D. ("Dr. Wright") acted with deliberate indifference to his serious medical needs; and that Defendants are entitled to qualified immunity. This matter was transferred to the undersigned on June 22, 2012. For the reasons discussed below, Defendants' motion for summary judgment is denied in part and granted in part.

## II.  Procedural History

On initial screening, this Court <u>sua sponte</u> dismissed the claims against three Facility Health Services Directors with DOCCS (Drs. Paolano, Ellen, and Weissman) because those individuals were involved in incidents that occurred prior to November 23, 2002, the cut-off date for the three-year statute of limitations applicable to this action. <u>See</u> Dkt #3 at 4.

Ippolito sought and was granted leave to file an amended complaint(Dkt #167)[1] which specifically raises causes of action based upon the Eighth Amendment. Count I alleges that Dr. Wright's failure to provide the Rebetron therapy unanimously recommended by

---

[1]

In addition to Dr. Wright, Goord, and P.A. Edwards, the Amended Complaint named individuals previously dismissed by Order entered March 8, 2006. These individuals are not properly a part of this lawsuit.

his primary care physicians constituted deliberate indifference to Plaintiff's serious medical needs. Dkt #167, ¶ 99. Count II alleges that the actions of Dr. Wright and Edwards in "mechanically following DOCS [sic] substance use history policy and refusing to prescribe . . . Rebetron [i.e., pegylated interferon and Ribavirin] . . . constituted deliberate indifference . . . ." Id., ¶ 100. Count III alleges that Dr. Wright, in implementing the alcohol and substance abuse treatment ("ASAT") prerequisite to receiving medical treatment for HCV, deprived Plaintiff of his rights under the Eighth Amendment. Id., ¶ 101. The fourth count (also denominated as Count III) asserts that Goord's actions "in tolerating DOCS [sic] substance use history policy" under which Dr. Wright and Edwards acted, "constituted deliberate indifference. . . ." Id., ¶ 102.

The Amended Complaint further alleges that the application of the ASAT prerequisite to Plaintiff lacks a rational basis. See id., ¶ 95(a)-(e). Liberally construed, the Amended Complaint also raises a claim under the Equal Protection Clause.

Plaintiff seeks injunctive relief against Defendants directing them to (1) immediately provide Rebetron therapy to Plaintiff, and (2) cease the practice of requiring inmates with a history of drug use who have not used drugs for six months prior to receiving HCV treatment to complete an ASAT program. Dkt #167, § VII, ¶ 2. Plaintiff also seeks an award of nominal damages against each

-3-

defendant, jointly and severally; compensatory damages of $100,000 against each defendant; and punitive damages in the amount of $100,000 each against Goord and Dr. Wright, and in the amount of $50,000 against Edwards. Id., § VII, ¶¶ 3-5.

Defendants did not submit an answer to the Amended Complaint, apparently relying on their Answer to the original Complaint.

After the parties exchanged written discovery over a period of three years, Defendants filed their first summary judgment motion on December 17, 2008. In a Decision and Order (Dkt #203) dated November 10, 2009, the Court (Larimer, D.J.) denied the motion on the basis that it lacked citations to appropriate legal authority and failed to mention any of the numerous cases from the Second Circuit, and district courts within this Circuit, dealing with Eighth Amendment issues involving inmates diagnosed with HCV. In addition, Judge Larimer noted, DOCCS and Dr. Wright recently had entered into a settlement as part of a class action challenging the ASAT requirement for inmates testing positive for HCV. See Hilton v. Wright, No. 9:05-CV-1038, 2008 WL 53670 (N.D.N.Y. Jan. 2, 2008).[2] However, neither Hilton nor any of the other seemingly

---

[2]

The settlement agreement mandated that DOCCS reevaluate any prisoner who was denied treatment for Hepatitis C because of the ASAT requirement within sixty (60) days of the earlier of the following events: (a) a prisoner is identified by DOCCS as an individual who was previously denied Hepatitis C treatment because of the ASAT requirement; or (b) a prisoner requests reevaluation, personally or through class counsel, and it is confirmed that the prisoner at the last evaluation had previously been denied treatment because of the ASAT requirement. Hilton, 2008 WL 53670,

-4-

relevant HCV cases had been cited or discussed by Defendants. Judge Larimer accordingly denied the motion without prejudice to a renewal on proper papers. Ippolito v. Goord, No. 05-CV-6683L, 2009 WL 3764194, at *1 (W.D.N.Y. Nov. 10, 2009), reconsideration denied, 2009 WL 4825112 (W.D.N.Y. Dec. 15, 2009).

On February 4, 2011, Defendants filed their Second Motion for Summary Judgment (Dkt #215). In their Memorandum of Law (Dkt #220), Defendants assert that the material facts as to which there is no genuine issue demonstrate that (1) Plaintiff did not suffer a serious medical need, (2) Dr. Wright was not deliberately indifferent to Plaintiff's medical needs, (3) Goord and Edwards were not personally involved in a constitutional violation, and (4) Defendants are entitled to qualified immunity. See Dkt #220 at 2. Plaintiff has opposed the motion. See Plaintiff's Statement of Facts (Dkt #235); Plaintiff's Memorandum of Law (Dkt #239).

## III.      Factual Background

Unless otherwise noted, the following facts are undisputed, and are derived from the parties' statements pursuant to FED. R. CIV. P. 56.1, affidavits and declarations, and other submissions.

### A.   The Parties

Ippolito has been in DOCCS' custody since August 1992, and tested positive for HCV in June 1996. See Declaration of John Cunningham (Dkt #189), ¶ 3. Ippolito alleges that Defendants have

---

at *1.

denied him appropriate treatment for that illness since 1999, specifically, "combination therapy" or "Rebetron therapy"[3] on the basis that he declined to enroll in an ASAT program. Plaintiff argues that there is no medical basis for conditioning his treatment for HCV on his enrollment in an ASAT program. Plaintiff admits that he used drugs and alcohol prior to his incarceration, but maintains that he has been free of both drugs and alcohol since 1992. Defendants have offered no evidence to rebut that statement.

Dr. Wright is the Deputy Commissioner and Chief Medical Officer of DOCCS. See Declaration of Lester N. Wright, M.D. ("Wright Decl.") (Dkt #190), ¶ 2. As Chief Medical Officer, he is responsible for the development and implementation of medical policies and practices for inmates in DOCCS' custody. Id., ¶ 5. Of particular interest here is the Hepatitis C Primary Care Practice Guideline ("PCPG") which, up until October 13, 2005, contained the ASAT prerequisite claimed by Plaintiff to be unconstitutional. Dr. Wright explains that he changed the policy after "losing a class action lawsuit [i.e., the Hilton case] challenging the ASAT prerequisite." Id., ¶ 28.

Dr. Wright personally never treated Plaintiff, but he was involved in the challenged denial of medical care insofar as he must approve every request by a treating physician to have an

---

[3]

Combination therapy consists of Pegylated Interferon and Ribavirin.

inmate receive any medical treatment for HCV. Dkt #190, ¶ 26.

Edwards has been employed at Attica since September 2, 1982. As a physician's assistant working under the supervision of a physician, Edwards diagnoses and treats medical conditions and is authorized to prescribe medications. However, Edwards is not authorized to order HCV treatment for inmates. See Dkt #32, ¶ 1.

Goord held the position of Commissioner of DOCCS from 1996 to 2006.[4]

### B. DOCCS Hepatitis C Primary Care Practice Guidelines

On March 31, 1999, DOCCS' Division of Health Services released a practice guideline regarding the screening of inmates for HCV and the treatment of inmates diagnosed with HCV. The March 1999 PCPG, which was developed by a committee consisting of medical doctors and nurses, purported to be consistent with "community standards of care", to include input from academic medical colleges and hospitals, and to consider "national guidelines, national consensus statements and recommendations, as well as articles in peer-reviewed medical journals." Defendants' Statement Pursuant to Rule 56.1, ¶ 10 (Dkt #42) (citing Dkt #190, ¶ 7). The March 1999 PCPG was revised on December 17, 1999, and provided that treatment

---

[4]     See http://www.correctionhistory.org/html/chronicl/goord/ goordretires2.html(last accessed Aug. 17, 2012). Defendants did not submit a declaration from Goord in support of either of their summary judgment motions or state anything about his position, apart from asserting that he has no personal involvement.

for HCV should be considered in accordance with the following
criteria:

> 10. No evidence of active substance abuse (drugs and/or
>     alcohol during the past six months (check urine
>     toxicology screen if drug use is suspected).

> 11. Successful completion of an ASAT program (the
>     inmate may be enrolled concurrently with hepatitis
>     C treatment if time does not allow for prior
>     completion of the program).

December 1999 PCPG at 3 (Dkt #42-3).

The December 1999 PCPG was revised on December 13, 2000, when
the tenth and eleventh criteria were merged into a single
paragraph. The next revision relevant to Ippolito's case occurred
on October 13, 2005, when the tenth criterion for treatment was
omitted, thereby removing the ASAT prerequisite. See Memorandum
from Dr. Wright to Facility Health Services Directors dated
10/13/05, submitted as part of Dkt #41. The eleventh criterion was
amended to read as follows:

> 11. No evidence of active substance abuse (alcohol,
>     heroin, cocaine, methamphetamine) during the past
>     six months. Inmates with active substance use will
>     be required to submit drug test samples routinely
>     at least monthly (at random intervals) until they
>     have been free of identified substance use for 6
>     months. The demonstrable 6 month period of
>     abstinence is deemed to commence on the day
>     following the last incident of substance use.

October 13, 2005 PCPG at 3, submitted as part of Dkt #41.

-8-

C.    **Plaintiff's Medical Issues**

1.    **Medical History Prior to November 2002**

As noted above, Plaintiff was diagnosed with HCV in June 1996.
In October 1997, Ippolito underwent a liver biopsy which revealed
mild portal fibrosis and no cirrhosis. See Dkt #189, ¶ 17 & id.,
Ex. A. From November 1997 to November 1998, Ippolito was treated
with interferon, the only HCV treatment available at that time. Id.
Ippolito initially responded, with his blood-tests showing an
undetectable viral load[5] in November 1998. See id. & Ex. B. By June
1999, Ippolito's "viral load had rebounded to 132,000 [sic][6],"
demonstrating that treatment had failed. Id., ¶ 18 (citing Exs. C[7]
& C2 (consultation note by gastroenterologist Dr. Agay Goel dated
11/26/99)).

---

[5]

"Viral load tests are blood tests that measure HCV ribonucleic acid
(RNA, or genetic material) in the blood. The presence of viral RNA
indicates that the virus is actively replicating (reproducing and
infecting new cells). . . . Viral load tests confirm whether an
individual is actively infected with HCV. Viral load test results were
previously measured in number of copies, but are now reported in terms
of    International    Units    per    milliliter    (IU/mL)."
http://www.hcvadvocate.org/hepatitis/factsheets_pdf/viralload.pdf
(last accessed July 23, 2012).

[6]

The exhibit to which Dr. Cunningham refers in his Declaration, Ex.
C2 to Dkt #189, indicates that Plaintiff's viral load actually was
elevated to 1,132,000 by June 11, 1999.

[7]

Ex. C to Dkt #189 is entirely illegible save for the heading, which
suggests that it is a laboratory report.

Plaintiff underwent a second biopsy on October 5, 1999, which showed "scattered areas of piece meal [sic] necrosis", no "bridging fibrosis", and no cirrhosis. <u>See</u> Dkt #189, Ex. D. Overall appearances were of chronic HCV with mild activity (grade 2) and portal fibrosis (stage 1). <u>Id.</u> In light of Plaintiff's high viral load and the results of the second biopsy, Dr. Goel directed that Plaintiff be started on Rebetron therapy without delay, provided that he was cleared by cardiology and psychiatry. <u>See</u> Dkt #189, Ex. C2. At Dr. Goel's request, Dr. Albert Paolano, Facility Health Services Director at Great Meadow, submitted a request for Rebetron to Dr. Wright. <u>See</u> Dkt #101, Ex. A. Dr. Paolano noted that Ippolito had agreed to participate in a non-sectarian ASAT program and that his urine tests showed no drug use. <u>Id.</u> at 2. Dr. Wright denied the request on December 5, 2000, noting, "[h]e can be approved as soon as he is signed up for ASAT." <u>Id.</u>

On January 14, 2000, Plaintiff's primary care physician at Elmira Correctional Facility, Dr. Uday Desai, personally submitted an order for Alpha Interferon and Ribavirin to Dr. Wright. <u>See</u> Dkt #167, Ex. F; Dkt #63, Ex. B. Dr. Desai noted that Ippolito's urine tests were negative for drug use. Dr. Wright responded by asking whether Plaintiff had had ASAT or some similar drug counseling. Dkt. #63, Ex. B at 3. At that point, Ippolito had not been able to sign up for ASAT, apparently because it was not offered at his facility.

In February 2000, Plaintiff was transferred to Riverview Correctional Facility where he received no treatment for his HCV. Dkt #167, ¶ 29. In May 2000, Plaintiff moved to Great Meadow Correctional Facility, where he reported to sick call at least five times complaining of joint pain in ankles and fingers, pain in right upper quadrant with radiation to right flank (liver pain), and extreme fatigue. Id., ¶ 31 & Ex. H (ambulatory health records from 8/17/00; 11/20/00; 11/22/00/ 12/21/00; and 1/11/01).

On September 5, 2000, and October 16, 2000, Plaintiff saw Dr. Paolano complaining of joint pain, liver pain, and extreme fatigue. Plaintiff requested combination therapy and stated that he would not participate in ASAT. Dkt #167, ¶¶ 32, 35. Dr. Paolano denied treatment, stating that Plaintiff must complete ASAT first. Id. & Exs. I, K.

After being transferred to Clinton Correctional Facility, Plaintiff saw Dr. Ellen, who denied his Rebetron therapy based upon Plaintiff's refusal to enroll in ASAT. Id., ¶ 38 & Ex. M.

In November 2001, he was transferred to Upstate Correctional Facility's Special Housing Unit. He was seen by sick call nurses several times for his complaints of joint pain, liver pain, and extreme fatigue in January, February, and April 2002. See Dkt. # 167, ¶ 44 & Ex. P (ambulatory health records).

After learning from blood test results conducted on April 29, 2002, that his ALT levels were quite elevated (100), he sent a

letter to FHSD Dr. Weissman at Upstate, requesting drug therapy for his HCV. Dr. Weissman denied the request on June 5, 2002, noting that "ASAT is a direct recommendation by Dr. Lester Wright before treatment can be started." See Dkt. #167, ¶¶ 46-47 & Exs. Q, R.

In October 2002, Plaintiff was transferred to Southport Correctional Facility ("Southport") SHU. He received no treatment for his HCV at that facility.

## 2.  Medical History After November 23, 2002

In January of 2003, Ippolito was moved to Attica. Dkt #167, ¶ 51. Edwards saw Ippolito on a "PA [Physician's Assistant] callout" on February 26, 2003. With regard to his HCV, Edwards offered to place him in Attica's RSAT[8] program but Ippolito declined. See Dkt #33, ¶ 3.

Ippolito notes that he reported to sick call at least twelve times while at Attica, complaining of extreme fatigue, joint pain, and liver pain. See Dkt #167., ¶55 & Ex. T. From 2003 through 2005, it appears that the only treatment Ippolito received for his HCV was monitoring of his viral load and liver function. See Dkt #42, ¶ 14.

On June 17, 2003, Ippolito saw Edwards and inquired about treatment for his HCV. Edwards informed him that such treatment was unavailable due to on his failure to complete ASAT or RSAT. On

---

[8]

See http://www.doccs.ny.gov/ProgramServices/substanceabuse.html for descriptions of the RSAT and ASAT programs offered by DOCCS.

July 1, 2003, Jose DePerio, M.D., the Facility Health Services Director at Attica, wrote a follow-up memo stating, "You have been informed twice . . . by PA Edwards, that completion of the RSAT program is a requirement for Hepatitis C treatment . . . [which] has not changed." Dkt #167, Ex. U.

On October 27, 2003, Ippolito filed a grievance challenging the denial of Rebetron therapy based upon the ASAT/RSAT requirement. On November 17, 2003, the Superintendent of Attica denied the grievance stating, "You cannot receive the treatment you are requesting until you have <u>completed</u> the RSAT program." Dkt #167, Ex. DD. Ippolito appealed, and the Inmate Grievance Program, Central Office Review Committee ("CORC"), denied the appeal on January 7, 2004, noting that "in accordance with the Deputy Commissioner's memorandum, dated 1/8/02,[9] <u>any</u> inmate who is diagnosed with Hepatitis C and requires medical treatment <u>must have completed or have enrolled in</u>[10] an ASAT, [or] RSAT . . . program."

---

[9]

    This memorandum does not appear to have been produced as a part of discovery.

[10]

    The problematic ambiguities in the PCPGs, discussed further below, are illustrated by the conflicting statements in the Superintendent's denial of the grievance and the CORC's denial of the appeal. The Superintendent noted that RSAT had to be completed before receiving HCV treatment, while the CORC's denial states that an inmate can be eligible to receive HCV treatment simply upon enrollment in ASAT or RSAT. However, there apparently was no criteria for determining when enrollment in, as opposed to completion of, ASAT would be sufficient. Additional ambiguity is seen in the CORC's interpretation of the PCPG as requiring <u>any</u> inmate-regardless of whether he or she had a history of substance or alcohol abuse-to enroll in ASAT before receiving HCV treatment. Based upon the Defendants' submissions from, <u>e.g.</u>, Dr. Wright and Dr.

Dkt #167, Ex. DD (emphases added). The CORC found that Ippolito had "offered no compelling reason to change" the HCV PCPG. Id.

Edwards ordered blood tests on October 25, 2004, and on February 9, 2005. On both occasions, the results indicated that Ippolito's ALT levels were elevated. Dkt #167, ¶¶60-61, Exs. W & X. Dr. Wright admits that "[e]levated ATL [sic] levels may indicate liver cell damage." Dkt #60, ¶ 16.

On September 9, 2004, Plaintiff was seen by Dr. Alan Bauer at Erie County Medical Center for a rheumatology consult, complaining of severe pain in his joints, especially his hands. Dr. Bauer, diagnosed Plaintiff as suffering from chronic HCV with arthralgia. In his recommendations, he stated, "Reconsider treatment of hepatitis C [with] Combination Rx." Dkt #215 at 255.[11] Apparently, no one with authority to do so acted on this recommendation. On January 19, 2005, Plaintiff returned to see Dr. Bauer. Lacking authority to order combination therapy, Dr. Bauer recommended that Plaintiff continue with analgesics to treat his arthralgia. See Dkt #215 at 249.

---

Cunningham, and their reasons for denying treatment to Ippolito (who had such a history), DOCCS' medical staff instead apparently interpreted the PCPGs as requiring ASAT only for individuals who actually had an alcohol and/or substance abuse history.

[11]     The exhibits attached to Dkt #215 are stamped with numerals in the lower right-hand corner, but the pages are not ordered sequentially, and some pages numbers are missing. Page citations in Dkt #215 are to the page numbers stamped in the bottom right corner of the pages.

Plaintiff saw Dr. Bauer in follow-up on May 16, 2005, at which point Dr. Bauer ruled out rheumatoid arthritis as the cause of Plaintiff's joint pain. Dr. Bauer stated that Plaintiff's arthralgia symptoms were part of the "clinical picture of HCV" and he recommended a follow-up with "GY", presumably, the gastroenterology department. See Dkt #215 at 250.

In May 2006, blood testing showed that Ippolito was co-infected with two types of HCV-genotype 1a and genotype 2b. Dkt #189, ¶ 23 & Ex. E. Repeat genotyping performed in September 2006 confirmed co-infection with genotypes 1a and 2b. Id. & Ex. G (Dkt #189).

On September 15, 2006, a request for approval of Rebetron therapy was submitted to Dr. Wright's office by one R. Magee, Registered Physician's Assistant. There is no documentation or explanation as to the events leading up to this request, which was approved by Dr. Wright. Plaintiff was permitted to commence Rebetron therapy on September 28, 2006, see Dkt #189, ¶ 25 & Exs. I, J, about eleven months after the ASAT prerequisite had been removed from the PCPG as the result of the Hilton class-action settlement.

Plaintiff underwent combination therapy for 51 weeks. See Dkt #190, ¶ 29. Based upon the blood test results submitted by Defendants, Ippolito's viral load has been undetectable (i.e., < 3200 copies/mL or < 615 μ/mL) beginning in March 15, 2007. His

viral load has remained undetectable according to the test results
from August 28, 2007; November 19, 2007; June 17, 2008; February
20, 2008; August 27, 2008; March 5, 2008; and January 7, 2011.
Defendants explain that an undetectable viral load is "the current
definition of a cure for [HCV]." Dkt #42, ¶ 17 (citing Dkt #189,
¶ 26).

## IV.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially,
the moving party must show that there is "an absence of evidence to
support the non-moving party's case." Celotex Corp. v. Catrett, 477
U.S. 317, 325 (1986). Once the moving party has carried its burden,
the opposing party must set forth "specific facts showing that
there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and
must introduce evidence beyond the mere pleadings to show that
there is an issue of material fact concerning "an element essential
to that party's case, and on which that party will bear the burden
of proof at trial." Celotex, 477 U.S. at 322.

A material fact is genuinely in dispute "if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

-16-

248 (1986). The reviewing court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (citation omitted). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) (citing Anderson, 477 U.S. at 250-51), cert. denied, 502 U.S. 849 (1991). If, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (quotation omitted).

Although the same standards apply when a pro se litigant is involved, such a litigant is given "special solicitude" in responding to a summary judgment motion. Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citations omitted).

## V.   Personal Involvement

To bring a § 1983 claim against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to assert that the defendant is a "link in the prison chain of command." McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (quotation omitted). "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot

rest on respondeat superior." <u>Hernandez v. Keane</u>, 341 F.3d 137, 144 (2d Cir. 2003) (citation omitted); <u>accord</u> <u>Richardson v. Goord</u>, 347 F.3d 431, 435 (2d Cir. 2003).

## A.   Physician's Assistant Edwards

In his capacity as a physician's assistant, Edwards did not have the authority to override Dr. Wright and order that Rebetron therapy be administered to Ippolito. Accordingly, the claims against Edwards must be dismissed for lack of personal involvement. <u>See</u> <u>Gillespie v. New York State Dept. of Corr. Servs.</u>, No. 9:08-CV-1339 (TJM/ATB), 2010 WL 1006634, *6 n.11 (N.D.N.Y. Feb. 22, 2010) ("The claims against defendant Harris would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician.") (citing <u>Smith v. Woods</u>, 9:05-CV-1439 (LEK/DEP), 2008 WL 788573, at *9 (N.D.N.Y. Mar. 20, 2008) (finding that prison social worker and psychologist had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff); other citation omitted)). Plaintiff has thus failed to raise a triable issue of fact as to P.A. Edwards's personal involvement

### B.   Former DOCCS' Commissioner Goord

Goord was the Commissioner of DOCCS from 1996 until 2006, and thus was the Commissioner during the relevant time-period (November 23, 2002, through the present). Plaintiff alleges that Goord was personally involved insofar as he tolerated an unconstitutional policy, namely, the PCPGs, to be applied to DOCCS inmates with chronic HCV. A supervisory official such as Goord may be personally involved in a constitutional violation in several ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Hernandez, 341 F.3d at 145; see also Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

Defendants did not submit a declaration or affidavit from Goord in support of either of their summary judgment motions, instead simply asserting in their memorandum of law that there is nothing in Plaintiff's medical records indicating that Goord was involved in the creation of the HCV PCPG or in Plaintiff's medical care or treatment decisions. Notwithstanding the relative sparseness of Defendants' motion papers, the Court is constrained

-19-

to conclude that Plaintiff has failed to raise a triable issue of fact as to Goord's involvement in the PCPGs or the treatment of HCV-positive inmates in general, or in Ippolito's case in particular. Accordingly, summary judgment is granted to Goord on the basis that he lacked personal involvement.

### C.   Dr. Wright, DOCCS' Chief Medical Officer

Defendants do not directly contest Dr. Wright's personal involvement, noting that Plaintiff's claim against him "depends on the unconstitutionality of the condition requiring . . . participat[ion] in ASAT prior to initiating HCV treatment. . . ." Dkt #220 at 13. Defendants essentially concede that if the PCPG was unconstitutional, then Dr. Wright may be liable. As discussed below, the Court concludes as a matter of law that the PCPG was ambiguous, medically unsupported, and unconstitutional as applied to Plaintiff.

Defendants' submissions establish that Dr. Wright was and is one of the officials responsible for formulating and implementing DOCCS' PCPG for treating HCV. See, e.g., Edwards' Response to Plaintiff's First Set of Interrogatories dated 10/25/06, at 5, ¶ 6 (naming Dr. Wright as one of the individuals responsible for creating the PCPGs) (Dkt # 33); Wright's Response to Plaintiff's Fifth Request for Admissions, dated 2/02/07 (Dkt #77) (admitting that he "directed" and "approved" implementation of the PCPG developed by the hepatitis C treatment task force). There is no

dispute that treatment was withheld from Ippolito as a result of the PCPG that Dr. Wright promulgated. Thus, to the extent that unconstitutional acts have occurred as a result of applying the PCPG, a reasonable jury easily could find that Dr. Wright "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873; cf. Brock, 315 F.3d at 165-66 (holding that a jury could conclude that Dr. Wright was personally involved in an alleged deprivation due to his promulgation of the DOCCS' policy at issue in that case).

## VI. Analysis of Plaintiff's Eighth Amendment Claims

### A.   General Legal Principles

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend VIII; see also, e.g., Estelle v. Gamble, 429 U.S. 97, 101 (1976).  To establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove that the prison official acted with the subjective mental state of "deliberate indifference" to the prisoner's objectively "serious medical needs." Id. at 104; accord, e.g., Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011). An Eighth Amendment claim for denial of medical care does not require that the inmate actually experience serious physical injury as a result of that denial. See Harrison v. Barkley, 219 F.3d 132, (2d Cir. 2000) (holding defendants' alleged refusal to treat inmate's tooth cavity

would constitute deliberate indifference to serious medical need under Eighth Amendment, even though inmate did not ultimately suffer serious physical harm, provided defendants knew of and disregarded risk to inmate's serious medical needs).

**B.    The Objective Component As Applied to Ippolito's Case**

Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment.  As a threshold matter, the Court must determine whether Ippolito's case is properly viewed under the "denial of treatment" or "delay in treatment" rubric, as the analyses are subtly different. See Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006).  Defendants contend that this claim is "properly analyzed as a delay in treatment culminating in [Plaintiff's] cure."  Dkt #220 at 8. Defendants assert that they could not have been deliberately indifferent because Plaintiff was properly treated for his HCV from 1996 to 2006, and the denial of the second round of interferon was appropriate pursuant to the PCPGs, which they describe as reasonable in light of prevailing norms of medical practice. Based upon the record as a whole, the Court disagrees and finds that Plaintiff has raised triable issues of fact with regard to the objective component of the deliberate indifference test.

The Court finds persuasive the analysis conducted by the district court in a recent inmate HCV case where the Eighth

Amendment claim was characterized as a denial of, rather than a delay in, treatment. See Hatzfeld v. Eagen, No. 9:08-CV-283(LES/DRH), 2010 WL 5579883, at *10-11 (N.D.N.Y. Dec. 10, 2010), report and recommendation adopted by Hatzfeld v. Eagen, NO. 9:08CV283 LES DRH, 2011 WL 124535 (N.D.N.Y. Jan 14, 2011). The Hatzfeld court distinguished Smith v. Carpenter, 316 F.3d 178 (2003), a delay-in-treatment case in which an HIV-positive prisoner challenged the failure to provide him with prescription HIV medication during a seven-day period and a five-day period. Id. at 185. Because the Eighth Amendment claim in Smith was "based on short-term interruptions in the otherwise adequate treatment" that the prisoner was receiving, it was "appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone" in analyzing whether the alleged deprivation was sufficiently serious. Id.

Relying on Smith, the medical defendants in Hatzfeld argued that the inquiry into the plaintiff's serious medical need should focus on the alleged three-month delay between Hatzfeld's renewed request for HCV treatment and the commencement of treatment. The district court rejected this attempted re-characterization because, unlike the plaintiff in Smith, Hatzfeld was not regularly receiving treatment for his underlying chronic HCV, having been denied treatment in 2002 and again in 2005. The district court noted that "[b]ut for the preliminary injunction . . . , or the policy change

one month later [as the result of the <u>Hilton</u> case], Hatzfeld might never have received treatment." <u>Hatzfeld</u>, 2010 WL 5579883, at *11. Therefore, the court held, it was inappropriate to treat Hatzfeld's case as one of delayed or interrupted treatment. <u>Id.</u>

It is true that Ippolito received interferon monotherapy in 1997 for his HCV. Although it initially was successful, his viral load rebounded in June of 1999. Thus, as Defendants' medical experts concede, the first therapy was a failure. Until September 2006, Defendants provided no other medical care specifically directed at treating and curing Ippolito's underlying HCV, or abating the damage HCV was causing to his liver, despite continued requests and recommendations from Ippolito's specialists to commence Rebetron therapy. The only treatment he received apparently was monitoring of his liver-function levels, which consistently revealed that one of the markers indicating impaired liver functioning was elevated above normal range, a finding which Dr. Wright has conceded may indicate liver cell damage.

Defendants further assert Plaintiff cannot argue that he was denied treatment for his HCV because he received "extensive treatment for <u>other</u> medical issues." Dkt #220 at 8 (citations omitted; emphasis supplied). Defendants neglect to mention, however, that a number of these "other medical issues" were caused by his hepatitis, namely, severe arthralgia (joint pain), fatigue, and flank pain. For instance, in September 2004, he was seen by

rheumatologist Dr. Bauer complaining of severe pain in his joints, especially his hands. Dr. Bauer ordered non-steroidal anti-inflammatories to treat Ippolito's pain, and requested that DOCCS "reconsider treatment of hepatitis C [with] combination Rx." See Dkt #215 at 255. Ippolito was seen again by Dr. Bauer on January 19, 2005, and May 18, 2005, regarding his persistent arthralgia, which the doctor described as part of the "clinical picture" of HCV, rheumatoid arthritis having been ruled out. Combination therapy was not ordered for Plaintiff despite Dr. Bauer's recommendation.

Defendants' provision of appropriate medical treatment for Ippolito's non-hepatitis medical conditions (e.g., his incomplete bladder emptying, gastroesphogeal reflux disorder, back cysts, and carpal tunnel syndrome) is not relevant to the issue of whether Defendants were deliberately indifferent to the serious medical need created by Plaintiff's HCV. None of the treatments for Plaintiff's non-HCV-related ailments ameliorated the clinical signs and symptoms of his chronic HCV; stopped the progression of the damage to his liver caused by HCV; or decreased his risk of hepatic cancer, liver failure, or death.

Here, as in Hatzfeld, 2010 WL 5579883, at *11, "but for" the October 13, 2005, deletion of the ASAT requirement to the PCPG, Ippolito might never have received Rebetron therapy. Even so, Defendants did not approve the commencement of Rebetron therapy

-25-

until September 2006, nearly a year after Defendants were forced to remove the ASAT prerequisite from the PCPGs. Defendants have offered no explanation regarding the eleven-month delay between the removal of the ASAT prerequisite from the PCPG and the commencement of Ippolito's Rebetron therapy. Accordingly, the Court finds that it is "inappropriate to treat this case as one of delayed or interrupted treatment." Hatzfeld, 2010 WL 5579883, at *11. Cf. Harrison v. Barkley, 219 F.3d at 137 ("This is not a case of delayed treatment as the dissent suggests. Defendants' conduct on this record can be construed as: (1) a flat refusal of medical treatment for a condition that if left untreated is serious and painful; or (2) a conditional refusal of such treatment, subject to [the inmate]'s consent to undergo an unwanted medical procedure that would deprive him of a body part he wished to keep. Either way, a reasonable jury could find that [the inmate] was refused treatment of a degenerative condition that tends to cause acute infections, debilitating pain and tooth loss if left untreated.").

Even if this case were characterized as one of delayed treatment, there remains an issue of fact as to the seriousness of Ippolito's medical condition. Drs. Wright and Cunningham state that Ippolito has achieved a sustained viral response and is essentially cured. However, Ippolito's most recent liver biopsy was in 1999. At that point, the findings were consistent with chronic HCV with mild activity (grade 2) and portal fibrosis (stage 1). Ippolito did not

receive Rebetron therapy until 2006–seven years after the second biopsy, and nine years after his first interferon monotherapy. In light of the lengthy delay between Ippolito's first and second interferon treatments, and the fact that his most recent biopsy was over ten years ago, there is a question of fact as to the extent of the liver damage Ippolito has sustained. Accord Hatzfeld, 2010 WL 5579883, at *11.

Defendants cite Pabon v. Wright, No. 99 Civ. 2196(WHP), 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004), in support of their assertion that Ippolito's eventual "cure" (i.e., the achievement of an undetectable viral load) precludes a finding of Eighth Amendment liability. Pabon, which involved Eighth Amendment claims brought by two HCV-positive inmates, Pabon and Ruiz, is distinguishable on its facts. Ruiz was diagnosed with HCV on July 16, 1997, and received a liver biopsy on April 1, 1998, after which he began receiving mono interferon treatments on July 1, 1998. Pabon, after being diagnosed with HCV on or about May 21, 1997, began receiving mono interferon on November 12, 1997. On October 28, 1998, the consulting infectious disease specialist recommended addition of Ribavirin, and DOCCS prescribed the drug for Pabon on November 4, 1998.

Thus, in contrast to the delay of approximately seven years in Ippolito's case, Pabon and Ruiz received treatment for their HCV in a matter of months. Although there was a delay of several months

-27-

with regard to Ruiz's biopsy, he began receiving interferon three months after the biopsy was completed. The district court in Pabon characterized the delays as "minimal" and amounting at most to mere negligence. Pabon is neither similar enough to the instant case to be persuasive, nor is it binding authority on this Court.

In DiChiara v. Wright, No. 06-cv-6123(KAM)(LB), 2011 WL 1303867 (E.D.N.Y. Mar. 31, 2011), the medical defendants asserted similar arguments to those asserted by Defendants here. The plaintiff, an HCV-positive inmate denied interferon therapy, was represented by counsel and had the benefit of a medical expert witness, who opined that treatment should be initiated once diagnosis of HCV is established and there is evidence of progressive disease, because treatment at that stage has the best chance of arresting the disease. DiChiara, 2011 WL 1303867, at *8 (citations to record omitted). DiChiara's expert stated that treatment with interferon, "protects the liver from further damage by slowing scarring and is therefore beneficial even to patients who end up being non-responders." Id. (quotation to record omitted).

The magistrate judge had concluded that the HCV-positive plaintiff-inmate failed to proffer evidence that the one year delay resulted in a "very likely" chance of future harm or that his condition actually worsened as a result of the delay, reasoning that because the plaintiff eventually cleared the HCV and because

his expert could not quantify the effect of a one year delay on the success rate for the treatment, he failed to present evidence that the delay violated his constitutional rights. 2011 WL 1303867, at *6 (citation to R&R omitted). The magistrate judge also had found that the plaintiff failed to proffer evidence that his alleged physical symptoms were caused by the delay in treatment, and thus could not recover for alleged mental or emotional injury suffered during the one year of delay. Id. (citation to R&R omitted). However, as the district court DiChiara noted, "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and . . . actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." Smith, 316 F.3d at 188.

The district court ultimately agreed with DiChiara that the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment. Like Ippolito, DiChiara failed to achieve the desired result from his first round of treatment. DiChiara, 2011 WL 1303867, at *8. Although the plaintiff's expert "could not quantify how the success in treatment would be affected by a delay, it was expert opinion that early treatment presented a better chance of arresting progression of the disease and protecting the liver." Id. Notwithstanding the plaintiff's eventual "cure", the district court found that DiChiara had "still presented sufficient evidence to raise a disputed

question of material fact for the jury whether the delay in treatment had an adverse medical effect of decreasing his chance of clearing the virus and was sufficiently serious, even if he cannot show a physical injury." Id. Thus, it was not fatal to the plaintiff's claim that he ultimately was successful in clearing the virus after he was released from prison. See id.

For the foregoing reasons, the Court concludes that Ippolito has raised a question of fact as to the objective prong of the deliberate indifference standard. Defendants' motion for summary judgment on this ground is denied.

### B.   The Subjective Component As Applied to Ippolito's Case

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). To be "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the [defendant] must both be aware of facts from which the interference could be drawn that a substantial risk of harm exists, and he must also draw that reference." Farmer v. Brennan, 511 U.S. 825, 837, 839-40 (1994). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. at 104. "Prison officials may, of course, introduce proof that they were not so aware, such as

-30-

testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" Salahuddin, 467 F.3d at 281 (quoting Farmer, 511 U.S. at 844). The Second Circuit has stated that a jury could infer the absence of a sufficiently culpable state of mind if the jury accepted "that the defendant denied the inmate medical treatment 'because the defendant[ ] sincerely and honestly believed that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable.'" Salahuddin, 467 F.3d at 281 (quoting Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005) (emphases supplied)).

In Johnson v. Wright, 412 F.3d 398, supra, the Second Circuit held that denial of HCV treatment solely because a prisoner had not completed the PCPG's ASAT prerequisite could create a triable issue of fact in three scenarios: (1) where there is consensus among the prisoners' medical providers that treatment is necessary regardless of the prerequisite, (2) where prison officials fail to determine whether the justifications for the ASAT prerequisite apply to the individual patient, and (3) where prison officials "reflexively" rely on the purported soundness of the guideline itself, even where they are on notice that a departure might be medically appropriate. Id. at 404-06.

Defendants here assert that Dr. Wright "sincerely believed his conduct posed no risk of serous harm or posed an insubstantial risk

of serious harm" because he "believed the DOCS HCV Primary Care Practice Guideline was supported by medical literature at the time." Dkt #220 at 13 (citing Dkt #190, ¶¶ 16-20, 28; Salahuddin, 467 F.3d at 281; other citation omitted). Defendants did not independently assess at the time whether the policy was medically justifiable in Ippolito's particular case, although they have belatedly come forward with other rationalizations, discussed further below. Defendants instead relied on their view of the PCPG as mandating denial of treatment to Ippolito.

Because Defendants have cited policy as the reason for their inaction, the question before this Court is whether following the policy amounted to deliberate indifference to Ippolito's specific medical needs. Brock v. Wright, 315 F.3d 158, 166 (2d Cir. 2003). "While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are the result of a policy promulgated by the defendant, a valid § 1983 action may lie." Id. at 165-66 (internal citation omitted). It is not seriously in dispute that Dr. Wright in part was responsible for formulating the PCPG, including the ASAT prerequisite. If following the policy resulted in deliberate indifference to Ippolito's medical needs, the Court may not grant summary judgment in favor of Dr. Wright, "since unconstitutional

acts would then have occurred as the result of a policy promulgated by [him]." Id.

As discussed below, all three scenarios discussed in Johnson are supported by the record.

### 1.  Consensus Among Plaintiff's Medical Providers

There is no dispute that Ippolito's medical providers were in consensus that combination or Rebetron treatment was necessary and medically appropriate, regardless of Ippolito's participation in ASAT. The first two recommendations by Ippolito's treating physicians occurred in 2000, and thus those denials of care are outside the time-period at issue in this lawsuit, which is November 23, 2002, to the present. However, Plaintiff requested Rebetron therapy when he saw P.A. Edwards on February 26, 2003, and June 17, 2003. He was informed by P.A. Edwards that, as per the PCPG approved and promulgated by Dr. Wright, he was not eligible for Rebetron therapy because he had not participated in ASAT. In September 2004, Dr. Bauer, who saw Plaintiff on a rheumatology consult, reported to the referring DOCCS' physician that Plaintiff should be reconsidered for Rebetron therapy. See Dkt #215 at 255. Plaintiff did not receive Rebetron therapy at that time, presumably due to his failure to complete ASAT in accordance with the PCPG approved and  promulgated by Dr. Wright. The Court notes that Dr. Bauer's recommendation was consistent with the previous

recommendations from all of Plaintiff's doctors, dating back to January 2000.

### 2. Failure to Determine Whether the Justifications for the ASAT Prerequisite Applied to Plaintiff

There is no evidence in the record that the decision not to prescribe Rebetron therapy to Plaintiff was, in fact, medically justifiable. Defendants' state that denial of Rebetron was based on the PCPG, which in turn was "based on medical consensus" "requir[ing] resolution of a drug treatment issue" before commencement of Rebetron therapy. However, Defendants have not come forward with any evidence substantiating that Ippolito had a current "drug treatment issue". Plaintiff states that he has not used any drugs from August 1992 to the present date. Plaintiff's Declaration in Opposition to Defendants' First Motion For Summary Judgment at 2, ¶ 4 (Dkt #197). Significantly, Defendants concede that Plaintiff has never tested positive for drug-use during his incarceration. Id. (citing Supplemental Reply Affirmation of Thomas Kidera, Esq. dated 9/09/08 (Dkt #173) ("Urinalysis tests conducted for disciplinary purposes are maintained in an inmate's disciplinary file and would exist outside of the medical record. No such records have yet been located for the plaintiff for any year after 1995."), attached as Ex. A to Dkt #197); see also Dkt #101, Ex. A (Rebetron treatment request submitted 12/5/00 notes "no dirty urine" results).

Furthermore, Ippolito actually received interferon therapy in 1997 and 1998, notwithstanding the fact that he had not completed ASAT at that time and was not presently enrolled in ASAT. This alone shows the arbitrariness of the decision to deny Plaintiff a second round of interferon therapy. It seriously called into the doubt the sincerity of Defendants' belief that the ASAT requirement not only was medically reasonable in general, but was actually necessary in Ippolito's case.

### 3. "Reflexive" Reliance on the Purported Soundness of the PCPG

There is "no evidence suggesting that the defendants took any step whatsoever to investigate—let alone verify—whether it would be medically appropriate to ignore the unanimous advice of [Ippolito]'s treating physicians, including prison physicians, and apply the Guideline's substance abuse policy in [Ippolito]'s case." Johnson, 412 F.3d at 404. Dr. Wright stated that he had "no knowledge" of whether Ippolito had used drugs during 1999 to 2005, see Dkt #42, although this appears to be untrue, given that he had been informed on at least one occasion by Dr. Paolano in December 2000 that Plaintiff's urine tests were negative for drugs or alcohol. P.A. Edwards admitted that when he saw Plaintiff on February 26, 2003, and June 17, 2003, he "took no steps to find out whether [P]laintiff had a history of active alcohol or substance abuse in the prior two years." Dkt #168, ¶ 6.

4.    **Lack of Support in the Medical Literature for the PCPGs and Ambiguities in the PCPGs**

The lack of support in the medical literature for the PCPGs fatally undermines Dr. Wright's contention that he sincerely believed that they mandated denial of Rebetron therapy to Ippolito. As an initial matter, the Court notes that the PCPGs in effect prior to October 13, 2005, did not unambiguously require an inmate such as Ippolito to participate in an ASAT program in order to receive treatment for HCV. The March 1999 and December 1999 PCPGs have two possible meanings. The March 1999 PCPG, which was in place at the time that Plaintiff underwent his second liver biopsy, states that one requirement, in order to receive treatment is "10. [n]o evidence of active substance abuse (drugs and/or alcohol) during the past 2 years (check urine toxicology screen if drug use is suspected)." March 1999 PCPG at 3. A separate requirement is as follows: "11. [s]uccessful completion of an ASAT program (the inmate may be enrolled concurrently with hepatitis C treatment if time does not allow for prior completion of the program)." Id. The December 1999 PCPG reduced the required two-year "substance-free" period to six-months. See December 1999 PCPG at 3. These two versions of the PCPGs could be read as requiring every inmate to enroll in an ASAT program–including those who have never used drugs or alcohol. However, in this lawsuit, Defendants have not argued that the PCPGs were intended to be applied in this manner. Since December 2000, when the active substance abuse criterion was merged

-36-

with the ASAT criterion, the PCGPs have required inmates with a "substance abuse history" to satisfy the ASAT, yet the PCPGs do not provide guidance as to who qualifies as having a "substance use history."

Defendants interpret these ambiguous provisions in the PCPGs as mandating that any inmate who has ever abused drugs and alcohol to enroll in ASAT. Although there is no evidence that Ippolito has actively used drugs or alcohol in the past twenty years, Defendants nonetheless interpreted the pre-October 13, 2005 PCPGs as requiring him to enroll in an ASAT program before receiving treatment for his HCV.

There is no medical justification for such a policy in the medical reports and consensus statements upon which Dr. Wright and the rest of the task force purported to rely in developing the PCPGs. As the district court explained in Morgan v. Koenigsmann, 03-CV-3987 (S.D.N.Y. Sept. 24, 2004) (Wood, D.J.) (unreported but attached hereto as Appendix 1), the documents relied upon by Defendants indicate that complications with interferon therapy may arise when treatment is given to persons who are actively using drugs or alcohol. Morgan, at pp. 19-21 (citing National Institutes of Health, Management of Hepatitis C, NIH Consensus Statement Online 1997 Mar. 24-26; 15(3): 1-41[12] ("[T]reatment of patients who

---

[12]    Also available at http://consensus.nih.gov/1997/1997HepatitisC105html.htm (last accessed Sept. 17, 2012).

-37-

are drinking significant amounts of alcohol or who are actively using illicit drugs should be delayed until these habits are discontinued for at least 6 months. Such patients are at risk for the potential toxic effects of alcohol and other drugs and also present problems with compliance. Treatment for addiction should be provided prior to treatment for hepatitis C.") (emphases added); Centers for Disease Control and Prevention ("CDC"). "Recommendations for Prevention and Control of Hepatitis C Virus (HCV) Infection and HCV-Related Chronic Disease" dated 10/16/98 ("the CDC Recommendations")[13] at 14 ("Treatment of patients who are drinking excessive amounts of alcohol or who are injecting illegal drugs should be delayed until these behaviors have been discontinued for ≥ 6 months.") (emphases added)).

Moreover, the 2002 NIH Consensus Statement recommends that treatment of both inmates and active drug and alcohol users be expanded. See National Institutes of Health ("NIH"). "Consensus Development Conference Statement, Management of Hepatitis C: 2002", dated Aug. 26, 2002, at 22 & 25 [14] ("[I]t is recommended that treatment of active injection drug use be considered on a case by-case basis, and that active injection drug use in and of itself

---

[13]    Also available at http://www.cdc.gov/mmwr/preview/mmwrhtml/00055154.htm (last accessed Sept. 17, 2012).

[14]    Also available at http://consensus.nih.gov/2002/2002hepatitisc2002116html.htm (last accessed Sept. 17, 2012).

not be used to exclude such patients from antiviral
therapy.")(emphases added)).

     The CDC's Recommendations, which were issued several months
before DOCCS adopted the first version of the PCPGs, specifically
stated that "[p]ersons who use or inject drugs [should] be advised
to stop using and injecting drugs [and] to enter and complete
substance-abuse treatment, including relapse-prevention programs."
CDC Recommendations at 18 (emphases added) (quoted in Morgan, at
p. 21). Thus, contrary to Defendants' characterization of the
medical community's consensus, the CDC was recommending in 1998
that persons who were actively drinking excessive amounts of
alcohol or who were actively injecting drugs be denied treatment
for a limited period of time, until such behavior had ceased, and
that those particular categories of individuals be encouraged to
enter substance abuse treatment programs, presumably for assistance
in stopping the behavior that was delaying their ability to receive
necessary medical treatment. The CDC's Recommendation cannot be
read as supporting a policy of categorically denying treatment to
an HCV-positive inmate with an extremely remote substance abuse
history and who was not, throughout the time that he was diagnosed
with HCV, either actively drinking alcohol or injecting drugs.

     Apart from the fact that the PCPGs were ambiguous in regards
to who must enroll in or complete ASAT, the PCPGs as promulgated by
Dr. Wright were without medical justification and their application

to Ippolito by Dr. Wright was made with deliberate indifference to his serious medical needs. See Brock, 315 F.3d at 165-67; cf. Domenech v. Goord, 196 Misc. 2d 522, 531, 766 N.Y.S.2d 287 (Sup. Ct. 2003), aff'd, 20 A.D.3d 416, 797 N.Y.S.2d 313 (2d Dept. 2005) (HCV-positive plaintiff claimed to be drug- and alcohol-free for over 30 years, and prison officials did not controvert this assertion; court concluded that the ASAT program was "irrelevant" for the petition and could not, "as a matter of law, provide a medical justification for the continued denial of medical treatment").

Significantly, Dr. Wright was one of two named defendants in Morgan v. Koenigsmann, decided in September 2004. In that case, as discussed above, District Judge Wood thoroughly reviewed the medical literature and explained the myriad ways in which the PCPGs were not in line with the medical community's consensus statements. That Dr. Wright was a named defendant in Morgan undermines the validity of his "sincere belie[f]" that the ASAT prerequisite was medically justified based on the various consensus statements.

In sum, the Court finds that the record is sufficient for it to conclude as a matter of law that Dr. Wright approved and promulgated PCPGs that were ambiguous and that resulted in the denial of necessary medical treatment to Plaintiff without adequate medical justification. The Court further finds as a matter of law that Dr. Wright was aware that the ambiguity in the PCPGs created

a risk that they would be interpreted to condition HCV treatment for a person, such as Plaintiff, on enrollment in an ASAT program. The Court also determines as a matter of law that Dr. Wright was aware of the medical risks that HCV patients, such as Plaintiff, would fact as a result of such an interpretation. See Brock, 315 F.3d at 165-67.

### 5.  Defendants' Other Reasons For Denying Treatment

In support of their summary judgment motion, Defendants belatedly have suggested several reasons, other than the ASAT requirement, for their denial of Rebetron therapy to Plaintiff.

Defendants first point to what they characterize as the historically slow progression of Plaintiff's disease, and the fact that his first HCV treatment was a failure, as reasons for denying a second round of interferon therapy. However, these reasons were never cited by Dr. Wright in his denials of the consulting physicians' requests for Rebetron therapy: the only reason given contemporaneously by Dr. Wright and other prison officials, such as Dr. DePerio, was Ippolito's failure to enroll in ASAT.

Next, Dr. Cunningham, Defendants' medical expert, notes that Plaintiff alleges he suffered "distress and fear concerning his future health and [had] suicidal ideation" as the result of being repeatedly denied Rebetron therapy. Dr. Cunningham suggests that the expression of suicidal ideation may have been a factor in the delay of a second treatment because, he explains, the aggravation

of psychiatric disorders is a significant side effect of pegylated interferon and Ribavirin (Rebetron). <u>See</u> Dkt #189, ¶ 7. Dr. Cunningham's attempt provide a <u>post hoc</u> rationalization for Defendants' inaction and failure to treat is disingenuous at best.[15] There is no evidence in the record that Plaintiff ever was treated for a depressive disorder or any other psychiatric condition. Finally, Dr. Cunningham's suggestion that psychiatric concerns underlay the denial of combination therapy is completely baseless, since, as noted above, the only reason provided by DOCCS' officials for denying Ippolito a second treatment was his failure to participate in ASAT.

The reasons discussed in the preceding paragraphs were never invoked to deny treatment to Plaintiff for his HCV and are unsupported by the record. As such, they cannot be used to justify the reasonableness of Defendants' inaction and failure to treat Plaintiff's HCV.

## VII. Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>,

---

[15]

Even if Ippolito did experience depression and suicidal ideation, it is not for this Court to say such thoughts were unreasonable, given that Ippolito was suffering from a potentially fatal disease.

457 U.S. 800, 818 (1982) (citations omitted); see also Saucier v. Katz, 533 U.S. 194, 201 (2001); Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009) (holding that the sequence of the Saucier two-step analysis is not mandatory).

A government official's actions are objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances." Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995)(citing Malley v. Briggs, 475 U.S. 335, 341 (1986)). Whether an official acts reasonably is determined by the state of the law applicable at the time of the alleged acts. Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Young v. County of Fulton, 160 F.3d 899, 930 (2d Cir. 1998). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004) (citation omitted).

## A.   Dr. Wright

Defendants seek qualified immunity from liability for Ippolito's Eighth Amendment claim by essentially arguing that, in the years 2002 to 2006, the law governing the obligations of prison officials to deliver health care to prisoners was not sufficiently clear to warn a reasonable person in Dr. Wright's position that he could not require inmates to enroll in ASAT as a condition for receiving standard treatment of HCV, a progressive and potentially

-43-

life-threatening illness. Although the PCPGs in effect prior to the Hilton case could have caused and did cause the complete denial of prescribed medical treatment for an inmate's serious medical condition, Defendants maintain that a prisoner's clearly established Eighth Amendment right to adequate medical care was not specific enough for Dr. Wright, the chief medical officer for DOCCS, to know that the policies in question were illegal. Instead, Defendants claim that for liability to attach, precedent must have clearly established the right to medical care of a particular illness (here, HCV), specifically without a particular barrier to the treatment (here, the ASAT requirement).

The Court declines to read the Eighth Amendment right here at issue in such a constricted manner. The Supreme Court has explained that "clearly established" for qualified immunity means that

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent. . . . In other words, the rights as set forth in the holdings of existing cases are clearly established not only as to the facts of the prior cases, but also as applied in contexts that reasonable officers would understand to fall within the scope of those rights.

Wilson v. Layne, 526 U.S. 603, 614-15, 640 (1999). In Farid v. Ellen, 593 F.3d 233 (2d cir. 2010), the Second Circuit confirmed that qualified immunity can be denied where a rule is "clearly foreshadow[ed]" by past precedent. Id. at (citing Tellier v.

Fields, 280 F.3d 69, 84 (2d Cir. 2000) (noting that for a right to be clearly established, "the precise conduct at issue need not previously have been ruled unlawful") (citation omitted).

Because the right in question was clearly established, summary judgment may not be granted if a rational jury could conclude that it was not objectively reasonable for Dr. Wright to believe he was acting in a constitutional manner. Viewing the evidence in the light most favorable to Ippolito, and drawing all permissible inferences in his favor, the Court finds, as a matter of law, that Dr. Wright's belief that his acts were constitutional was objectively unreasonable. As discussed above, as a result of the ambiguous PCPGS, which were not supported by the medical literature, Ippolito was denied necessary medical care for his serious, potentially life-threatening, chronic illness, without medical justification. It was objectively unreasonable for Dr. Wright to believe that it was constitutional to promulgate a policy that requires prison officials who know of an inmate's serious medical needs to disregard those needs, unless the inmate agrees to participate in an ASAT program. The fact that Dr. Wright has extensive experience in supervising and coordinating DOCCS' provision of health services to thousands of inmates further bolsters this Court's conclusion that a jury could find his actions and omissions objectively unreasonable. See Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir. 2000).

**B.     Former Commissioner Goord and P.A. Edwards**

Because the Court has concluded that P.A. Goord is entitled to summary judgment with respect to liability on the basis that he lacked the requisite personal involvement, the Court need not consider whether he would otherwise be entitled to qualified immunity.

**VIII.     Equal Protection Claim**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an equal protection violation, the plaintiff must show that he was treated differently than other individuals in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination. In addition, a valid equal protection claim may be brought by a "class of one" where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); see also Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005).

Plaintiff has offered no evidence that he was treated differently from other, similarly situated inmates. Accordingly,

his "class of one" equal protection claim fails as a matter of law and is dismissed.

## IX.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. #215) is denied in part and granted in part as set forth above in this Decision and Order. In particular, summary judgment is granted to Goord and Edwards, and the Amended Complaint is dismissed in its entirety as to both of them.

Summary judgment is denied as to Dr. Wright on the Eighth Amendment claims raised in the Amended Complaint as the Court finds as a matter of law that Plaintiff's Eighth Amendment rights were violated, that Dr. Wright had personal involvement in the violations, and that he is not entitled to qualified immunity. Summary judgment is granted to Dr. Wright to the extent that the Amended Complaint's Equal Protection Claim is dismissed with prejudice.

All that remains for determination in this case is the issue of damages sustained by Plaintiff as a result of the Eighth Amendment violations.

A pre-trial scheduling order shall follow forthwith.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
September 19, 2012

-47-

# Appendix 1